# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:08-CR-11-TS |
| | ) | |
| HARVEY R. FIELDS, JR. | ) | |

## OPINION AND ORDER

On a cold January evening in 2008, the Defendant, Harvery R. Fields, was sitting in a green Ford Explorer in an alley behind Lutheran Social Services in Fort Wayne, Indiana. Police were dispatched to this location when a 911 caller reported that a group of suspicious people and vehicles were in the alley behind Lutheran Social Services, including a person walking up the alley with a big gun. When officers of the Fort Wayne Police Department arrived, they saw a car drive out of the alley. As officers advanced down the dark alley on alert for any individuals with guns, they saw the Explorer parked in the back of the Lutheran Social Services building. The truck was running and the Defendant was sitting in the driver's seat. The exchange that followed between the police and the Defendant resulted in the discovery of a firearm and drugs inside the Explorer, the Defendant's arrest, and an Indictment against the Defendant. The Defendant contends that police unlawfully detained him and he has moved to suppress from evidence the firearm and drugs seized from his vehicle, as well as any statements he made to police following his detention.

## BACKGROUND

On February 27, 2008, the Government charged in an Indictment that, on January 19 and 22, 2008, the Defendant possessed with intent to distribute crack cocaine in violation of 21

U.S.C. § 841(a)(1) (Counts 1 and 3) and possessed a firearm having already been convicted of a felony in violation of 18 U.S.C. § 922(g)(1) (Count 2). On May 2, the Defendant filed a Motion to Suppress Evidence [DE 13], alleging that when police detained him they did not have reasonable suspicion, grounded in specific and articulable facts, that he may be involved in criminal activity. On July 10, the Court conducted an evidentiary hearing on the Motion to Suppress Evidence. The Defendant was present and represented by attorney Stanley Campbell, and the Government was represented by Assistant United States Attorney Tina Nommay. At the conclusion of the hearing, the Court took the Motion under advisement and gave the parties additional time to file briefs.

On October 6, the Defendant filed his Brief in Support of Motion to Suppress Evidence [DE 22]. He argues that after officers approached his vehicle and asked him what he was doing in the alley, their questioning should have ceased because "[n]o reason existed for the continued questioning of Fields and no basis existed for the officer to order Fields out of the car." (Def. Br. 3.) On November 7, the Government filed its Post Hearing Response in Opposition to Defendant's Motion to Suppress [DE 23]. The Government submits that the officers' initial contact with the Defendant was a consensual encounter in which the police sought voluntary cooperation from the Defendant. The Government argues that, additionally, the 911 call and the officers' observations provided justification for an investigatory detention, and that the discovery of a gun in plain view inside the vehicle then provided further justification for the officers' actions, including the Defendant's arrest and search of his vehicle. In the Defendant's Reply Brief [DE 24], filed on November 18, the Defendant disagrees with the Government's characterization of a consensual encounter and reiterates that the Defendant exhibited no

behavior to support any suspicion that he was involved in criminal activity.

## THE EVIDENTIARY HEARING

During the July 10 evidentiary hearing, the Government presented the testimony of Officers John Drummer, Marc DeShaies, Michael Sierks, and Detective Miguel Rivera, as well as a Google Earth map of the alley behind Lutheran Social Services, a CD of the 911 call and dispatch, and photographs that depicted the outside of the Ford Explorer and the contents and placement of the firearm and the crack cocaine inside the Explorer. The Defendant also testified, directly opposing the testimony of the Government's witnesses on several points, which the Court will discuss in more detail later in this Opinion and Order.

**A.     The 911 Call**

Shortly after 9:00 PM on January 19, 2008, a call came into a 911 operator in Fort Wayne, Indiana. The 911 tape reveals that the caller was concerned about "suspicious" cars and people in the alley near her house. She said that they were located right behind Lutheran Social Services. The caller stated that she did not know what was going on, but that she was "kinda scared." When prompted to describe what was happening, she stated that it "looked like" the people had guns. After the 911 operator pressed further regarding the details of what she saw, the caller stated that one man was walking up the alley with a gun. The 911 operator asked whether the gun was a long gun or a hand gun, and the caller stated that she did not know, but that it "looked like a big gun." When asked how long ago this occurred, she stated, "just now" and that they were "still back there." The operator asked the caller to provide her name, which she did.

She also provided the additional details that there were two vehicles and about eight guys. One vehicle was a "4 x 4," or truck, and the other was a "nice car." She said that all of the individuals in the alley were black. The caller prompted police to hurry on several occasions before she said she had to go, and hung up the phone.

B.     The Police Dispatch

After receiving the 911 call, police dispatch immediately alerted units in the area that there was a party armed in the alley behind Lutheran Social Services, also identified as the rear of 3300 South Calhoun. The tape of the dispatch reveals that officers were advised that several black males were standing around in the alley, that one had a long gun of some type, that the subject had been walking up the alley, and that the 911 caller said to hurry.

C.     The Area Behind Lutheran Social Services

Lutheran Social Services is located at 3300 South Calhoun Street. An alley with angled parking spots services the area behind Lutheran Social Services and the establishment next to it. The alley runs north and south, and is between Calhoun Street on the east and Harrison Street on the west. The cross street to the north is Packard Avenue. Across from the businesses that back onto the alley are driveways and parking areas for access to the rear entries of residences that are located on Harrison Street. In the evening, none of the establishments that back onto the alley are open for business.

D.     Officers' Response

Officers Drummer, DeShaies, and Sierks were patrolling in the vicinity of Calhoun in their separate squad cars when they heard the dispatch and responded. When Officer Drummer arrived, he parked his squad car on Packard near the North entrance to the alley. Due to the nature of the call, he retrieved his shotgun and started to approach the alley on foot. As he reached the corner to turn south down the alley he saw a small, dark-colored vehicle with three people inside drive out of the alley.[1] As he made his way toward Lutheran Social Services, Officer Drummer used the dark part of the alley next to the buildings and the dumpsters as cover. He saw a dark, four-door Ford Explorer with exhaust coming from it backed up to Lutheran Social Services. The Explorer was not parked in one of the angled parking spaces, but was backed straight in, a portion of the vehicle covering painted no-parking slashes. The Explorer was the only vehicle parked behind the businesses, which are located on the east side of the alley, and Officer Drummer did not see any other people in the alley.

At the same time, Officer DeShaies had parked his squad car outside of the alley behind Officer Drummer's, and was also walking down the alley with his shot gun. Officer DeShaies was twenty to thirty feet behind Officer Drummer. Officer Sierks had also responded by this time and was driving his squad car slightly behind and next to Officer Drummer, heading toward the Explorer. As Officer Drummer reached the parked Explorer, Officer Sierks turned his squad car's spotlight on it, surprising the Defendant, who was sitting in the driver's seat.

Officer Drummer immediately approached the Defendant on the driver's side with his shotgun in the low and ready position and asked the Defendant what he was doing in the alley.

---

[1] Detective Rivera arrived at the north entrance to the alley about the same time that Officer Drummer was turning the corner to head down the alley. Because other officers were already investigating the alley, Detective Rivera followed the car.

Officer Sierks got out of his squad car and scanned inside the vehicle through the windows, looking for the long gun that was referenced in the dispatch. He looked only on the seats, not the floor, of the truck. The Defendant told the officers that he was in the alley talking to some of his friends. Officer Drummer asked where the friends were and the Defendant stated that they just left. Officer Drummer told the Defendant that police were responding to a call that someone was armed at that location, noted that there were no other vehicles in the area and that the Defendant was the only person in the alley. Officer Drummer then asked the Defendant if he had any weapons on him or in the vehicle. The Defendant did not reply. When Officer Drummer asked a second time, the Defendant looked down and said, "Uh, no." Officer Drummer asked the Defendant to step out of the Explorer so that police could do a pat down and make sure that he was not armed. The Defendant complied.

By the time the Defendant got out of the Explorer, Officers DeShaies was there and again asked the Defendant if he had any weapons. The Defendant did not reply. At the same time, Officer Drummer started walking around the Explorer and looking through the windows with his flashlight. He first looked through the driver's window, then walked around the back of the Explorer to the passenger side. When he looked through the small passenger side back window, he saw the handgrip and back part of a handgun on the floor behind the passenger seat. The front of the gun was underneath the passenger seat. Officer Drummer alerted the other officers about the gun, and they told the Defendant to get on the ground and placed him in handcuffs.

A records check revealed that the Defendant did not have a current handgun permit. Because he being arrested for possession of a handgun, the police started to do a pre-tow inventory of the Explorer. During the inventory, Officer Drummer discovered a baggie of crack

cocaine in the center console between the front seats.

**E.      Photographs of the Evidence**

Officer DeShaies drove his squad car into the alley, both so officers could put the Defendant in the car and so he could get his digital camera to take pictures of the scene and the evidence.  Officer DeShaies took pictures of the handgun as it appeared from outside the Explorer, as well as the crack cocaine as it appeared inside the Explorer. When Officer DeShaies took the picture of the handgun, he stood behind the front passenger seat looking through the small back window. One of the pictures shows most of the gun in view, with about two inches of the barrel underneath the seat and two inches of the handgrip obscured by the Explorer's back bench seat. A picture taken a little further away and behind the front seat shows less of the gun because more of it is obscured by the back seat from that particular angle. The officers testified that they did not move anything inside the Explorer to take the pictures of the handgun.

**F.      The Defendant's Testimony**

The Defendant testified at the evidentiary hearing. He admitted that he was parked in the alley, but stated that the officers' testimony about where he parked was wrong, and that he was actually parked further South. He testified that he went to the alley with a passenger who had gone into a house that faced Harrison Street.

The Defendant testified that he was sitting in the truck talking on the phone when he "heard the gun," which caused him to look around and see an officer approaching him on the

driver's side with a gun pointed at his head. (Sup. Hr'g. Tr. 57.)[2] He said that there were no police cars in the alley and no spot light was used. He ended his phone call, rolled down his window a little bit, and said "Yeah." The officer told him that police had been called about gunshots being fired. He testified that the officers told him to get out of the car, he complied, and they put him on the ground and searched him and his vehicle. He testified that, while he was on the ground, he saw one of the officers search his car and move the passenger seat up before announcing that he found a gun, which caused the officer who already had him on the ground to knee him in the back. (Sup. Hr'g Tr. 59.)

The Defendant testified that the photograph taken by Officer DeShaies does not accurately show how his passenger rode. He stated that the seat, as shown in the photograph, is too straight up and that the seat was reclined and further back when his passenger sat in it.

On cross examination, the Defendant testified that his passenger wanted a ride because he was shorted on some "dope" that he bought, but he did not know what kind of dope was involved. He testified that he did not know this when he initially offered him a ride, and had the Defendant known, he would not have taken him. The Defendant stated that he did not simply leave when he found out because his friend did not have a coat and would have been cold.

Detective Rivera, who interviewed the Defendant at the scene after his arrest, testified that the Defendant told him that he was helping a friend who had been shorted on a drug deal involving crack cocaine. Detective Rivera testified that the Defendant told him that he, along with his friend and other black males, approached the house that was directly across from where his vehicle was still parked, which was 3315 South Harrison Street. During his investigation,

---

[2] The Defendant does not explain exactly what he heard when he "heard the gun."

Detective Rivera went to the house at 3315 South Harrison Street and found a glass door broken in with a cement cinder block. There was also evidence of a quick exit through the front of the house.

On January 19, 2008, the Defendant was on supervised release for a conviction for possessing with intent to distribute crack cocaine.

**DISCUSSION**

The Fourth Amendment to the United States Constitution protects people from unreasonable searches and seizures. U.S. Const. amend. IV (guaranteeing the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures"). An officer may conduct an investigatory stop of a person or vehicle if articulable facts support a reasonable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1 (1968). Such stops must be limited in scope and executed through the least restrictive means reasonable. *Id.* To determine whether reasonable suspicion exists, a court examines "the totality of circumstances known to the police at the time of the stop, including the experience of the officers and the behavior and characteristics of the suspect." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006). Reasonable suspicion is less than probable cause, but more than a hunch. *United States v. Grogg*, 534 F.3d 807 (7th Cir. 2008). It is a "commonsense, nontechnical" concept that deals with "the factual and practical consideration of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (internal quotations marks omitted).

The investigation in this case was prompted by a 911 emergency call. Police officers

have a duty "to speedily respond to emergency situations reported by individuals through the 911 system." *United States v. Drake*, 456 F.3d 771, 774 (7th Cir. 2006). The Seventh Circuit presumes the "reliability of an eyewitness 911 call reporting an emergency situation for purposes of establishing reasonable suspicion, particularly when the caller identifies herself." *Id.* Here, the caller provided her name and a contemporaneous eyewitness report of an ongoing emergency involving two vehicles and about eight people hanging out in an alley, one of them walking down the alley with a big gun. She stated that she was scared and urged several times for the police to hurry. Thus the call does not present the reliability problems associated with anonymous tips. *See Florida v. J.L.*, 529 U.S. 266, 270–71 (2000) (holding that a tip from an unknown person from an unknown location that a person is carrying a gun, without more, does not carry sufficient indicia of reliability to justify a police officer's stop and frisk of that person); *United States v. Whitaker*, 546 F.3d 902, 905 (7th Cir. 2008) (distinguishing *J.L.* where the 911 center received two calls in close succession, one from a person who identified himself, that alerted the police to an ongoing altercation); *United States v. Hicks*, 531 F.3d 555, 558–59 (7th Cir. 2008) (holding that *J.L.* did not govern because the 911 caller provided "enough information to identify him and his location, and because he reported an ongoing emergency"); *Drake*, 456 F.3d at 774–75 (distinguishing an anonymous tip from a contemporaneous eyewitness report of an emergency situation because the latter carries sufficient indicia of reliability).

The Defendant does not argue that the caller's report of an ongoing emergency was not reliable, or that her call did not create reasonable suspicion of criminal activity. Rather, it appears that his argument is that any reasonable suspicion created by the 911 call should not have included him because he was not engaging in any suspicious activity. He argues:

> At best, the police had a report of around eighteen (18) people and two (2) cars in the alleyway behind Calhoun Street (Govt.'s Exhibit 6). The caller said that one of the individuals had a gun. The conclusion that a bunch of people "did not look right to her" is of no value to the Government. She did not describe any activity that would lead to a reasonable, particularized suspicion, except for the fact that one of the individuals had a gun. It was not particularly late in the evening, there were residences in the area, and when the police arrived, one vehicle was parked in an area that was designated as parking spaces. Nothing that Fields did or didn't do added any suspicion.

(Def. Br. 3, DE 24).[3]

The Court finds that, under the totality of circumstances, it was reasonable for the police who responded to the dispatch to investigate the sole vehicle that they found in the alley long enough to ascertain whether its occupant was involved in the activity reported in the 911 emergency call, specifically, the possession of a gun. Police were dispatched to the alley of 3300 South Calhoun, which was the back of the Lutheran Social Services building. When police arrived at this location, they saw a single car with several passengers leave the alley and then spotted the Explorer parked in the alley and running. They had no reason to doubt the caller's report regarding the recent presence of two vehicles, several people, and at least one gun in that alley. Thus, the presumption that the caller was reliable remained intact and the police were entitled to believe that a black male had recently been carrying a gun in the alley to which they were dispatched. Not only was the Defendant the only person the responding officers found in the alley, he was parked in the exact location provided in the dispatch, and he matched the race of the individuals identified by the 911 caller.[4] Therefore, even if sitting in a parked vehicle in a

---

[3] Although the Defendant states that the caller reported about eighteen people, the Court concludes from its review of the evidence that the number she reported was eight.

[4] The Court credits the officers' testimony about the location of the Explorer in the alley. Further, even if the Defendant was parked further south in the alley as he asserts, he would have still be in the section of the alley and near the building identified in the dispatch. The slight difference in his location would not have lessened the

11

dark alley behind closed business establishments was otherwise innocent behavior, police could consider it in determining whether reasonable suspicion existed to detain the Defendant in light of the information they received from the dispatch. *See United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003) (holding that "police observation of an individual, fitting a police dispatch description of a person involved in a disturbance, near in time and geographic location to the disturbance establishes a reasonable suspicion that the individual is the subject of the dispatch"); *see also Hicks*, 531 F.3d at 558 (citing to *Lenoir* for the proposition that "[u]nder most circumstances, when an officer observes someone who fits the description given by a dispatcher of a person involved in a disturbance, the officer may stop the suspect").

The Defendant's presence in the alley cannot be considered in isolation, but must be examined in light of all the factors known to the police. *United States v. Zambrana*, 428 F.3d 670, 675 (7th Cir. 2005) (stating that a court cannot evaluate and reject each factor in isolation from other factors); *see also United States v. Arvizu*, 534 U.S. 266, 277 (2002) ("A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct"). In isolation, the fact that the Defendant was sitting alone in his haphazardly parked and running truck, in a dark alley, on a cold night, behind closed business establishments, would suggest that he was out of place, but it might not warrant a belief that he was armed. However, this was the same alley where a group of men had recently gathered, where at least one of these men had a gun, and from which a car with several people inside had just left. The Defendant was the only person remaining in the alley, and no reasonable explanation for his presence was otherwise obvious. He was not parked at an open business establishment, or in the spaces designated for

---

importance of the Defendant's presence in that immediate vicinity.

access to any of the residents. Thus, the degree of suspicion that attached to his presence in the alley, when considered with all the factors known to the police, justified further investigation by the officers responding to the 911 emergency, and detaining the Defendant long enough to ascertain whether the situation described by the caller was still an ongoing threat.[5]

The Defendant argues that even if his initial detention was justified, the actions of the police were not related in scope to the circumstances that justified the interference in the first place. During their investigatory detention, the officers were entitled to "ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). Importantly, the officers were also permitted "to take reasonable steps to insure their own safety." *United States v. Jackson*, 300 F.3d 740, 746 (7th Cir. 2002). In doing so, the officers were entitled to order the Defendant to exit his vehicle, and to conduct a pat-down search of his outer clothing. *United States v. Hendricks*, 319 F.3d 993, 1004 (7th Cir. 2003).

By the time the officers reached the Explorer, they knew and observed enough facts to reasonably fear that the Defendant was the armed party who was the subject of the 911 call and the dispatch. The Defendant's answer to why he was in the alley did not cause any of their suspicion to dissipate. In fact, it was consistent with the caller's description of a group of people

---

[5] The Government contends that the initial encounter was consensual, and that the police were merely seeking voluntary information from the Defendant. The Defendant disagrees with this characterization. The Court finds that it is not necessary to decide whether the initial contact between Officer Drummer and the Defendant was consensual because the police had reasonable suspicion to detain the Defendant long enough to determine whether illegal activity was afoot. Moreover, even if the encounter was consensual at its inception, it soon turned into a detention with the presence of three uniformed officers, two of them holding shotguns in the low, ready position while asking the Defendant to exit his truck to be frisked, and a squad car facing the Defendant's vehicle with its spot light shining.

being in the alley. When questioned about weapons, the Defendant first declined to answer. When asked a second time, he looked down and away as he answered. While these actions were only marginally suspicious in and of themselves, they also did nothing to dispel the officers' objectively reasonable suspicion that the occupant of the lone vehicle in the alley was the subject of the dispatch and was potentially armed. This suspicion "independently preserved the justification for a protective frisk." *United States v. Barnett*, 505 F.3d 637, 640 (7th Cir. 2007) (holding that because a suspect's nervousness and indirectness kept the officer's suspicion of his involvement in a crime that likely involved a weapon alive during questioning, the objectively reasonable suspicion that he was armed also remained alive). The officers could also consider the Defendant's hesitancy and failure to make eye contact when answering as a factor that, not only failed to dispel but, increased suspicion. *See United States v. Brown*, 188 F.3d 860, 865 (7th Cir. 1999) ("Nervousness or refusal to make eye contact alone will not justify a *Terry* stop and pat-down . . . but such behavior may be considered a factor in the totality of circumstances."). As articulated by the Supreme Court in *Terry*, this Court cannot say that the officers' decision at that point to seize the Defendant and order him to exit the Explorer for a pat-down of his clothing "was the product of a volatile or inventive imagination, or was undertaken simply as an act of harassment; the record evidences the tempered act of a policeman who in the course of an investigation had to make a quick decision as to how to protect himself and others from possible danger, and took limited steps to do so." *Terry*, 392 U.S. at 28.

Soon after deciding to have the Defendant exit the Explorer for officer safety, an officer saw a gun in plain view inside the Explorer. "There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the

vehicle by either inquisitive passersby or diligent police officers." *Texas v. Brown*, 460 U.S. 730, 740 (1983); *cf. United States v. Powell*, 929 F.2d 1190, 1196 (7th Cir. 1991) (holding that the defendant's only basis for challenging an officer's view of an article through the window of the truck as he stood outside it was to challenge the lawfulness of the officer's stop of, and presence outside, the vehicle because the observation of an article in plain view does not involve any invasion of privacy). The Defendant argues that because he was forced out of his vehicle without reasonable suspicion before the officers looked through the window and saw the firearm, the "offensive conduct on the part of the police occurred prior to the look into the vehicle that revealed the gun" (Def. Reply 3, DE 24), and the cases involving police peering into unoccupied vehicles are not applicable. The Defendant's argument is foreclosed by the Court's finding that the officers were lawfully investigating whether the Defendant was the subject of the 911 call and the corresponding dispatch for a party armed.

Even if peering inside the truck's window could be considered a search under the Fourth Amendment, the officer's conduct did not violate the Defendant's rights. When officers reasonably fear for their safety during the course of a lawful investigatory stop, they are within their authority to conduct a search of a vehicle that is limited to the areas in which a weapon could be placed or hidden. *Michigan v. Long*, 463 U.S. 1032, 1049 (1983); *United States v. Denney*, 771 F.2d 318, 322 (7th Cir. 1985) (stating that once the legality of an investigative detention is established, a police officer is entitled to conduct a protective search for weapons in the passenger compartment of the vehicle if the officer has an articulable and specific suspicion that the suspect is potentially dangerous). "That the officer may have the individual under his control outside of the automobile, as in this case, does not render objectively unreasonable the

15

officer's belief that the individual is potentially dangerous." *United States v. Longmire*, 761 F.2d 411, 419 (7th Cir. 1985) (citing *Long*, 463 U.S. at 1051); *see also United States v. Boden*, 854 F.2d 983, 994 (7th Cir. 1988) (holding that protective search inside vehicle for weapons was reasonable even though the police had moved the subject of a *Terry* stop away from his vehicle, because there was a continuing possibility that suspect who was not under arrest could return to the car).

In finding that the actions of the police were confined in scope to an intrusion reasonably designed to discover a gun and did not violate the Defendant's constitutional rights, the Court notes that it does not credit the Defendant's testimony that police put him on the ground in handcuffs, and then searched his vehicle, including moving the seat, to find the gun. This testimony directly contradicts the testimony of three officers. The Defendant presented himself as less than truthful in numerous areas of testimony, making his statements about the search all the less credible. For example, he provided testimony that contradicted the testimony and photographs regarding where along the alley he was parked, contradicted the officers' testimony that Officer Sierks drove his squad car down the alley and used his spot light, and contradicted Detective Rivera's testimony about what the Defendant told him he was doing in the alley on the night of his arrest. Neither does the Court credit the Defendant's testimony that he first noticed the police when he "heard a gun" outside his car window and saw a gun pointed at his head. The Court finds that, contrary to the Defendant's statement, the officers observed the gun in plain view inside the vehicle, properly arrested him, and then performed an inventory search.

## CONCLUSION AND ORDER

The officers' actions did not violate the Defendant's Fourth Amendment rights, and there is no basis to suppress the firearm, crack cocaine, or the Defendant's statements. The officers in this case did not detain the Defendant on the basis of pure hunch or inchoate and unparticularized suspicion; their actions were the rational response to an identified citizen's 911 emergency call. The officers had reasonable suspicion supported by articulable facts that the Defendant may have been engaged in criminal activity, and that this conduct involved the possession of a gun. The officers diligently pursued a course of conduct intended to dispel or confirm their suspicions quickly, during which time it was necessary to ensure their own safety. An officer looking through the windows of the vehicle saw a handgun in plain view. After probable cause to arrest the Defendant developed, the officers found crack cocaine during a permissible inventory search of the Defendant's vehicle.

The Defendant's Motion to Suppress [DE 13] is DENIED. A Final Telephonic Pretrial Conference is set for Monday, January 5, 2009, at 11:30 AM before Judge Theresa L. Springmann. A jury trial is scheduled for Tuesday, January 13, 2009, at 8:30 AM before Judge Theresa L. Springmann.

SO ORDERED on December 18, 2008.

                                        s/ Theresa L. Springmann
                                        THERESA L. SPRINGMANN
                                        UNITED STATES DISTRICT COURT